# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE N. CAVIN<br>and THERESA CAVIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 4987 |
| | ) | |
| HOME LOAN CENTER INC., d/b/a<br>HOMELOANCENTER.COM, | ) | **Judge Ruben Castillo** |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Illinois residents Lawrence and Theresa Cavin ("Plaintiffs") filed this class action against Home Loan Center Inc. d/b/a HomeLoanCenter.com ("Defendant"), claiming that the company accessed their credit reports without a permissible purpose in violation of the Fair Credit Reporting Act ("FCRA" or "the Act"), 15 U.S.C. § 1681 *et seq.* (R. 1, Compl. at 1.) Before the Court are the parties' cross-motions for summary judgment. For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment is granted.

## BACKGROUND[1]

### I. Factual Background

In 2005, Plaintiffs received promotional materials from Defendant stating that they had been pre-approved to obtain a "SmartLoan" mortgage. (R. 122, Pl.'s Resp. to Def.'s Facts

---

[1] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1. Unless otherwise indicated, the facts included herein are undisputed.

¶ 5-6.) Over the course of a month, they received three separate mailers for the SmartLoan, two of which were addressed to Lawrence Cavin and one of which was addressed to his wife, Theresa Cavin. (R. 1, Compl., Ex. A-C.) In all relevant respects, the mailers are identical, and we therefore refer to them collectively herein as "the mailers" or "the SmartLoan mailers."

The SmartLoan mailers state: "This 'prescreened' offer of credit is based on information in your credit report indicating that you meet certain critera." (R. 1, Compl. ¶¶ 7, 10, Ex. A-C.) The mailers further state, "With this offer, you can lower your interest rate and reduce your monthly payment with the option to get extra cash to pay off your debt, make home improvements, or take a vacation. Please use the payment schedule above to see how low your payment could be." In the top right hand corner, the mailers contain a box listing sample payments for loans ranging from $100,000 to $600,000. (Id., Ex. A-C.) For instance, for a loan of $100,000, the mailers list the "NEW payment" as $322. (Id.)

The back of the mailers contain additional terms and conditions regarding the SmartLoan, stating, "This offer may not be extended if, after responding to this offer, you do not meet the criteria used in the selection process. Further, HomeLoanCenter.com will verify income and employment, review credit, and analyze debt and your equity position in the subject property prior to final loan approval." (Id.) The mailers also state, "This advertisement does not constitute an offer to enter into an interest rate and/or discount point agreement."[2] (Id.)

---

[2] Defendant asserts that this language is required by Minnesota law. Plaintiffs deny Defendant's assertion that the language is required by Minnesota law; however, they do not provide any basis for their denial except to state, "A search of Illinois laws reveals that the quoted statement is not required in mailers sent to Illinois residents." (R. 122, Pl's. Resp. to Def.'s Facts ¶ 23.) This response does not fairly meet the substance of Defendant's Rule 56.1 statement, and therefore, we deem the matter admitted.

In the following paragraph, the mailers describe the terms of the SmartLoan program as

follows:

> Start rate of 1.00% is fixed for the first 30 days with a fixed payment option for the first 12 months. Terms of payment are based on a margin of 2.10% plus the 1-Month MTA [Monthly Treasury Average] Index 2.022% (as of February 16, 2005). APR [Annual Percentage Rate] of 4.271% is based on a 30-year term, $200,000 loan amount at 1.00%, and may change if the index adjusts after the first 30 days. In the illustrative payment chart shown on the front of this letter, the APR's corresponding to the listed payments are as follows: $100,000 loan amount, 5.16% APR; $200,000 loan amount, 4.471% APR; $300,000 loan amount, 4.437% APR; $400,000 loan amount, 4.419% APR; $500,000 loan amount, 4.408% APR; $600,000 loan amount, 4.401% APR. If minimum payment option is selected, deferred interest may accrue. Interest rate quoted assumes a credit score of 620+ with a loan-to-value (LTV) of 80% on primary residence. The APR and payment will vary based on the specific the loan selected and verification of information and credit. Rates are subject to change without notice.

(R. 1, Compl., Ex. A-C.) Further down the page the mailers state, "Not all applicants will be

approved. Terms and conditions apply, call for details." (*Id.*)

Defendant offers only one loan product under its SmartLoan program. (R. 122, Pl.'s

Resp. to Def.'s Facts ¶ 9.) The loan is an adjustable rate mortgage based on the Monthly

Treasury Average ("MTA") index plus a margin, with a 1% interest start rate and a term of 30

years. (*Id.* ¶ 10.) The loan is secured by a first mortgage/deed of trust. (*Id.*) Under the loan, a

borrower has certain payment options each month, including a minimum payment based on 1%

interest. (R. 123-1, Def.'s Resp. to Pl.'s Facts ¶ 53-54.) If a borrower selects the minimum

payment option, deferred interest may be added to the principal balance of the loan. (*Id.* ¶ 54.)

This is known as "negative amortization." (R. 124, Def.'s Mem. in Opp. to Pl.'s Mot. for Summ.

J., Ex. A (Bd. of Govs. of the Fed. Reserve Sys., "Interest-Only Mortgage Payments and

Payment-Option ARMS, Are They For You?") at 1.) The SmartLoan has a maximum negative amortization and thus may "recast" after five years to ensure that the loan is paid off within the scheduled amortization period of 30 years. (R. 123-1, Def.'s Resp. to Pl.'s Facts ¶ 55.) In other words, borrowers are not permitted to make the interest-only payments indefinitely; if they choose this option they still must pay the loan off within 30 years. The loan provisions addressing maximum negative amortization and recasting are not included in the mailers. (*Id.* ¶ 56.) Neither of the Plaintiffs responded to the subject mailer or applied for credit from the Defendants. However, other persons within Illinois who received the promotional materials responded to Defendant's offer, and some ultimately obtained a SmartLoan.[3] (R. 133, Def.'s Resp. to Pl.'s Facts (Filed Under Seal) ¶¶ 72-74.)

### 2. *Procedural History*

Plaintiffs filed this action in August 2005 on behalf of themselves and all others similarly situated, alleging that Defendant improperly accessed their credit reports in order to send them the SmartLoan mailers. There is no dispute that Defendant did not have Plaintiffs' express permission to access their credit reports. (*See* R. 123-1, Def.'s Resp. to Pl.'s Facts ¶ 8.) Rather, the case hinges on whether the SmartLoan mailers constitute a "firm offer of credit," which is a permissible basis for obtaining a consumer's credit report under FCRA. In their complaint,

---

[3] Proprietary business information about the Defendant's loan application process and the borrowers who applied for and obtained the loans was filed under seal pursuant to a protective order previously entered by this Court. (*See* R. 37.) Based on privacy concerns, the Court also permitted the parties to file under seal detailed information about Plaintiffs' credit histories. Due to the existence of the protective order, the Court permitted the original summary judgment filings to be filed under seal, while redacted versions of the documents that omitted the confidential information were placed in the public record. Unless otherwise noted, all documents referenced in this order are the redacted versions that are part of the public file in this case.

Plaintiffs allege that the mailers cannot be considered firm offers because they are "vague and totally lacking in terms." (R. 1, Compl. ¶¶ 28-30(a).) This Court previously certified a class pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of: (a) all persons with Illinois addresses; (b) to whom the defendant sent or caused to be sent material in the form represented by Exhibits A-C; (c) on or after a date two years prior the filing of this action; and (d) before 20 days after the filing of this action; (e) who did not obtain credit in response thereto. *Cavin v. Home Loan Center*, 236 F.R.D. 387, 396 (N.D. Ill. 2006).

The parties have now filed cross-motions for summary judgment. (R. 88, Def.'s Mot. for Summ. J.; R. 94, Pl.'s Mot. for Summ. J.) Plaintiffs argue that Defendant lacked a permissible purpose for accessing their credit reports, and that the SmartLoan mailers could not be considered firm offers because they "fail to contain any terms, whatsoever, which would inform the consumer what is being offered." (R. 94, Pl.'s Mot. for Summ. J. at ¶ 1.) Plaintiffs further argue that the SmartLoan mailers are "deceptive" because they "fail to disclose that the product is a dangerous loan that results in negative amortization leaving the borrower owing more money in 5 years when the loan recasts." (*Id.*) Based on these inadequacies in the mailers, Plaintiffs argue that they are entitled to summary judgment on their FCRA claim.

On the other hand, Defendant argues that the mailers constitute firm offers because they "offered a valuable and popular home mortgage loan worth hundreds of thousands of dollars. . . ." (R. 90, Def.'s Mem. in Support of Mot. for Summ. J. at 1.) Defendant further argues that the mailers contain enough of the material terms for a recipient to determine whether the offer had value. To the extent any terms were not included in the mailers, Defendant asserts that this was based on the "reality that some types of credit products, like mortgage loans and

5

insurance policies, have features and terms that cannot be fixed in advance based solely upon data obtained from prescreening programs." (R. 124, Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. at 6.) Defendant also argues that even if this Court were to find that it violated the FCRA, Plaintiff has failed to prove that it did so willfully, which is a prerequisite to an award of damages. (*Id.* at 10-14; R. 90, Def.'s Mem. in Supp. of Mot. for Summ. J. at 8-12.) Finally, Defendant argues that Plaintiffs have failed to demonstrate that they suffered any actual injury and are therefore not entitled to recover under the FCRA. (R. 90, Def.'s Mem. in Supp. of Mot. for Summ. J. at 12.)

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). When the parties have filed cross-motions for summary judgment, the Court must "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

6

## LEGAL ANALYSIS

Congress enacted the FCRA to protect consumer privacy in the information maintained by consumer reporting agencies. 15 U.S.C. § 1681(a)(4) ("There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."). Pursuant to the FCRA, a consumer's credit report may be obtained only with the written consent of the consumer or for certain "permissible purposes" that are specified in the Act. 15 U.S.C. § 1681b(a); *Cole v. U.S. Capital*, 389 F.3d 719, 725 (7th Cir. 2005). One such permissible purpose is to extend a "firm offer of credit" to the consumer. 15 U.S.C. § 1681a(1); *Cole*, 389 F.3d at 725. The FCRA defines "firm offer of credit" as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a report to the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(1).

In *Cole*, the Seventh Circuit held that an offer must have sufficient value to the consumer to be considered a firm offer of credit. *Cole*, 389 F.3d at 726. The Court reasoned that failing to incorporate the concept of value to the consumer "upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screening process. From the consumer's perspective, an offer of credit without value is the equivalent of an advertisement or solicitation." *Id.* at 726-27. In other words, "Congress did not intend to allow access to consumer credit information for catalogs and sales pitches." *Id.* at 727.

In determining whether an offer has sufficient value to the consumer, courts must consider "the entire offer and the effect of all the material conditions," including the amount of

7

credit to be extended, whether approval is guaranteed, and the terms of the offer, such as the rate of interest charged, the method of computing interest, and the length of the repayment period. *Id.* at 727. If the court determines that the offer was merely a "guise for solicitation rather than a legitimate credit product," it cannot be considered a firm offer. *Id.* at 727-28. Additionally, the terms of an offer, such as the interest rate or method of computing interest, "may be so onerous as to deprive the offer of any appreciable value." *Id.* at 728.

In applying these principles, *Cole* determined that the district court erred in dismissing the plaintiff's FCRA claim at the pleading stage. *Id.* The Court pointed to several factors, including "the relatively small amount of credit" being offered "combined with the known limitations of the offer," specifically, that the credit offer could only be used toward the purchase a car at a particular dealership. *Id.* The limited nature of the offer, coupled with the fact that material terms were missing from the offer, made it impossible to determine whether the offer had value based on the pleadings. Therefore, the plaintiff's claim should not have been dismissed. *Id.*

Two years after deciding *Cole*, the Seventh Circuit clarified that an offer need not present an "attractive deal for the great majority of consumers" for it to have value for purposes of the FCRA. *Perry v. First Nat. Bank*, 459 F.3d 816, 825 (7th Cir. 2006). The solicitation at issue in *Perry* offered a credit card with a minimum credit line of $250. *Id.* at 824. In order to receive the card, the consumer would be required to pay a total of $184 in fees, $175 of which would be charged on the first month's bill. Outstanding balances would be subject to an annual percentage rate of 18.9%. The plaintiffs in *Perry* argued that given these usurious terms, the offer being pitched was "virtually worthless" and thus was not a firm offer of credit under the FCRA. *Id.*

8

A majority of the panel disagreed, holding that the solicitation at issue did not present the same problems as the solicitation in *Cole* for three reasons. First, it was clear the recipient had been pre-approved for the offer, unlike in *Cole* where it was not clear whether approval was guaranteed. Second, the interest rate of 18.9% was disclosed, unlike in *Cole* where material terms were not disclosed and consumers were simply invited to call for further information. Third, although the credit limit was low, the card could be used to purchase virtually any product or service, unlike in *Cole* where the credit offered could only be used toward the purchase of a vehicle at a particular car dealership. *Id.* at 825.

The majority acknowledged that the solicitation was not offering a particularly good deal: "We recognize that First National's credit solicitation requires card holders to pay a significant amount of money in fees, which are quite high in relation to the credit line offered. We realize that this is not an attractive deal for the great majority of consumers. However, the card is not without value." *Id.* For instance, a card holder who paid off the balance each month would be permitted to make almost $3,000 in purchases in one year. *Id.* Additionally, the card might be useful to individuals who were establishing credit for the first time or attempting to reestablish good credit. *Id.* In other words, because the offer might have utility for some consumers, the offer had sufficient value for purposes of the FCRA.[4]

---

[4] One judge dissented in *Perry*, concluding that the majority had taken an improperly narrow view of *Cole*. *Id.* at 826 (Evans, J., dissenting). The dissent declined to conclude that the defendant's offer had value simply because it might have "some utility" for a consumer "whose financial history is so catastrophic that a card encumbered by usurious fees, along with 18.9% interest, is the only option for rehabilitating a credit rating." *Id.* at 827. According to the dissent, the credit card offered by the defendant was not a "legitimate credit product" but was instead an "unconscionably one-sided financial deal that defies a reasonable concept of sufficient value." *Id.* The plaintiffs' petition for rehearing and rehearing *en banc* was denied on October 19, 2006, and accordingly, the *Perry* majority's opinion governs the disposition of this case.

9

Thus, the *Perry* court identified three factors to guide courts in considering whether an offer has value: (1) whether it appears likely the offer would be honored; (2) whether the material terms of the offer are adequately disclosed; and (3) whether the amount of credit being offered is minimal or subject to so many limitations that it is of little value. Pursuant to *Cole* and *Perry*, no one factor is determinative; rather, the Court must consider the factors together when analyzing the entirety of the offer. *See Cole*, 389 F.3d at 728; *Perry*, 459 F.3d at 824. Applying these factors, the Court concludes that the SmartLoan mailers were firm offers of credit.

### A. *Whether The SmartLoan Offer Would Be Honored*

First, unlike in *Cole* where it was not clear whether approval was guaranteed, the SmartLoan mailers indicate that the recipients were "preapproved." Moreover, although Plaintiffs did not respond to the offer, other Illinois consumers responded to the offer and some obtained a SmartLoan. Plaintiffs argue that because only a small number of persons responded to the offer and obtained a SmartLoan, this proves the offer was worthless. We do not find this argument persuasive, however, because as the Seventh Circuit has recognized, "[M]ost consumers who receive credit solicitations do not apply for the offered credit [product], regardless of how attractive the terms of the offer are." *Perry*, 459 F.3d at 826; *see also* R. 145-4, Reply Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. C (Bd. of Govs. of the Fed. Reserve Sys., "Report to Congress on Practices of the Consumer Credit Industry," dated June 2006) at 24 (noting that "as the number of mailed solicitations has grown, response rates have fallen, reaching a record of low of 0.4 percent in 2004—a trend that may reflect a mature market").

Plaintiffs also argue that the SmartLoan offer was illusory because the mailers state, "Not all applicants will be approved" and, "Terms and conditions apply, call for details." (R. 121-1,

10

Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2, 5-6.) Defendant counters that this language was included because final approval for a SmartLoan was contingent on the consumer's provision of additional financial information that would not be included in the credit report, such as the value of their home and their current income.[5] (R. 124, Def's. Mem. in Opp. to Pl.'s Mot. for Summ. J. at 8-9; R. 91, Def.'s Facts ¶ 57.) The FCRA permits a firm offer of credit to be conditioned on certain requirements: The creditor may apply additional pre-determined criteria bearing on the consumer's creditworthiness; require verification that the consumer meet the specific criteria used to select the consumer for the offer; and require the consumer to furnish collateral. 15 U.S.C. § 1681a(l)(1)-(3). To the extent approval for a SmartLoan was not guaranteed, a review of the mailers in their entirety indicates that approval was contingent on factors that are permissible under the statute, such as verification of income and provision of collateral.

Plaintiffs also argue that the words, "This advertisement does not constitute an offer to enter into an interest rate and/or discount point agreement" negates any possibility that the mailers contained a firm offer. (R. 96, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 6-7.) Defendant has offered evidence that Minnesota law required this language to be included in mailers sent to persons within that state. (R. 124, Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. at 9.) The applicable Minnesota statute governs "mortgage rate-lock agreements," which are agreements in which a lender promises to guarantee or "lock in" an interest rate or number of

---

[5] Plaintiffs deny Defendant's statement that a consumer's credit report does not contain income information or property value information, stating, "Mortgages are listed and inference can be drawn from the balance." (R. 122, Pl.'s Resp. to Def.'s Facts ¶ 59.) They offer no support for this assertion, but even if we assume that mortgage balances are listed in the credit report, it is unclear what "inference" may be drawn from a mortgage balance. There is no evidence before us that a consumer's credit report would contain specific information about his or her current income or current valuation of properties he or she owns.

11

discount points, or both, for a specified period of time. *See* Minn. Stat. § 47.206; *River City Mortgage Corp. v. Baldus*, 695 N.W.2d 375 (Minn. App. Ct. 2005). The statute requires specific criteria for a mortgage rate-lock agreement to be enforceable, including that the agreement be in writing, that it express consideration, that it have a definitive expiration date, and that it be signed by the lender and the borrower. Minn. Stat. § 47.206(3)-(4). As is pertinent here, the statute also requires that a written statement of current loan terms and conditions be accompanied by a disclaimer that the statement is not an offer to enter into a mortgage rate-lock agreement. Minn. Stat. § 47.206(5).

Read in context, we do not believe the inclusion of the "this advertisement" language to mean that the SmartLoan offer would not be honored by Defendant, nor do we believe an ordinary consumer would read it in this manner. Plaintiffs place significance on the words: "*This advertisement is not an offer. . . .*" However, when read in its entirety the sentence states: "This advertisement is not an offer *to enter into an interest rate and/or discount point agreement.*" We believe the language is merely an attempt by Defendant to alert recipients of the mailers that the offer being pitched is *not* an offer to enter into a mortgage-rate lock agreement. We also do not find the mailers' use of the term "advertisement" determinative, because in numerous other places the mailers use the term "offer." (*See* R. 1, Compl., Ex. A-C.). We thus do not find persuasive Plaintiffs' argument that the inclusion of this language negates any possibility that the mailers contained a firm offer.

In sum, because we find no indication that the SmartLoan offer would not be honored, the first *Perry* factor weighs in favor of a determination that the SmartLoan mailers constituted firm offers.

12

## B.    Whether The Material Terms of the SmartLoan Offer Were Adequately Disclosed

Second, unlike the mailer in *Cole* which provided essentially no terms at all about the

loan being offered but simply invited recipients to call for further information, the SmartLoan

mailers contain specific information about the type of credit product being offered. The mailers

indicate that the offer is for an adjustable-rate mortgage with a 1% interest payment option for a

fixed period. The mailers also provide a sample payment chart, identify the basis for calculating

interest (a margin plus a specified Treasury index), provide the length of the loan (30 years),

indicate that rates may change after the first 30 days, disclose that deferred interest may accrue if

a borrower chooses the minimum payment option, and indicate what additional information

would be needed (income, debt analysis, and property appraisal) to obtain a loan. We therefore

disagree with Plaintiffs' assertion that the mailers "fail to contain any terms, whatsoever, which

would inform the consumer what is being offered." (R 94, Pl's. Mem. in Supp. of Mot. for

Summ. J. at 1.)

It is true that the mailers do not provide the precise interest rate that will apply to each

individual borrower, and they also do not disclose every term and condition of the loan, such as

the maximum negative amortization provisions and whether prepayment penalties or other fees

will apply. However, we do not read *Cole* or *Perry* to require disclosure of every single loan

term for an offer to be considered firm. Such a requirement poses particular difficulty in the case

of a mortgage, because unlike a credit card, a mortgage is tailored to the individual consumer

depending on such factors as how much he or she wishes to borrow, his or her current income,

and the value of the property offered as collateral; all of this information would have to be

13

provided by the individual borrower. *See Murray v. HSBC Auto Finance, Inc.*, No. 05 C 4040, 2006 WL 2861954 at \*4 (N.D. Ill. Sept. 27, 2006) ("It is hard to determine what specific information [the defendant] could provide in the mailer regarding the interest rate and loan terms that might be available from a credit report, when the FTC has acknowledged that those terms are contingent on additional information that [the plaintiff] would have to provide herself."); *see also* R. 90, Def.'s Mem. in Supp. of Mot. for Summ. J., Ex. C (Office of Thrift Supervision Reg. Bulletin 37-13 at 1300.12) (explaining that while some information may be determined based on pre-screening, a home mortgage lender "must determine other criteria individually, such as the DTI [debt-to-income ratio], when consumers respond to the offer"); R. 90, Def.'s Mem. in Supp. of Mot. for Summ. J., Ex. D (Richard F. DeMong & James E. Burroughs, "Mortgage Pricing is Based On Risk") (discussing how interest rate and loan terms are based on risk analysis that evaluates such factors as the individual borrower's income, loan-to-value ratio, and debt-to-income ratio).

As to the specific loan terms Plaintiffs find lacking, it is not apparent that prepayment penalties will apply to every borrower, and similarly, the maximum negative amortization will only come into play if a borrower chooses to make minimum payments for a five-year period. *See Murray v. New Cingular Wireless Serv., Inc.*, 432 F. Supp. 2d 788, 792 (N.D. Ill. 2006) (missing terms not critical since they "may never factor into the transaction at all"). We also do not think it unreasonable to presume that an ordinary consumer would understand that interest-only payments cannot continue indefinitely, and that a lender will ultimately require repayment of the principal of the loan. *See Perry*, 459 F.3d at 825 (recognizing that "a company like [defendant] will not offer credit to consumers on terms that will not allow it to earn a return");

14

*see also Soroka v. Homeowners Loan Corp.*, No. 05cv2029, 2006 U.S. Dist. LEXIS 38847 at *9 (M.D. Fla. 2006) ("Every consumer and every lender has a common understanding that home loans are made for a definite period of time, that banks charge interest for lending money, and that interest rates are subject to change."). Thus, while the mailers may have been improved by an explanation of the negative maximum amortization provision and fees that may apply, we do not find the absence of these terms fatal to the firmness of the offer. *See Murray*, 2006 WL 2861954 at *5 (finding offer had value even though defendant "could probably improve" mailer by explaining additional terms).

Plaintiffs point to cases where other courts have found mailers deficient due to their failure to disclose interest rates or other important terms; however, a careful review of these cases indicates that the missing terms were merely one factor considered by the court in view of the entire offer. For instance, in *Murray v. Finance America*, No. 05 C 1255, 2006 WL 862832 (N.D. Ill. Apr. 4, 2006), the mailer at issue was found to be deficient because it provided virtually no information at all about the type of loan being offered. Indeed, the sum and substance of the mailer was the following:

> We are very pleased to inform you that you have been pre-qualified for a home loan from Finance America. To find out how much you qualify for, please call us today at 1-800-303-4944. At Finance America, we have the resources to provide a home loan that best fits your needs. Whether you are looking to refinance your loan or purchase a new home, we offer fixed, interest-only and hybrid loan programs to fit most financial circumstances.

*Id.* at *1. The District Court had no difficulty finding that this vague letter was exactly the type of guise for solicitation prohibited by *Cole*. *Id.* at *2-3; *see also Murray v. E*Trade Financial*

15

*Corp.*, No. 05 C 5433, 2006 WL 2054381 at *2-3 (N.D. Ill. July 19, 2006) (mailer deficient because it failed to contain information about method or length of repayment period and stated only that interest rate was 1.99% for three months and thereafter would vary according to the market); *Krey v. Jennings Chevrolet, Inc.*, No. 06 C 5043, 2006 WL 3392200 (N.D. Ill. Nov. 17, 2006) (mailer deficient because it failed to provide interest rate, method of computation, or length of repayment period); *Murray v. IndyMac Bank, F.S.B.*, --- F. Supp. 2d ---, 2006 WL 3253643 (N.D. Ill. Nov. 7, 2006) (mailer not a firm offer because of combination of absence of material loan terms, lack of clarity concerning what type of loan was being offered, and language negating possibility that offer would be honored).

The ultimate question is whether the mailers, considered as a whole, contain enough terms for consumers to determine whether the offer has any value to them. *See Cole*, 389 F.3d at 728. Despite Plaintiffs' efforts to characterize the SmartLoan mailers as the same type of "sham" offers found deficient in the above cases, a review of the mailers in their entirety indicates that they provide far more detailed information about the credit product being offered. Other cases have held that an offer may have value even though it does not spell out every term and condition of the credit product being offered. *See Murray*, 432 F. Supp. 2d at 792 (offer had value even though it did not disclose that some consumers would have to pay a deposit to activate service and that interest would accrue on late payments); *Forrest v. Universal Savings Bank, F.A.*, No. 06cv445, 2006 WL 3486913 at *3-4 (E.D. Wis. Dec. 1, 2006) (offer had value even though precise amount of credit to be extended was not disclosed).

Further, although the mailers state, "Rates are subject to change without notice," when read in context we believe this statement merely reflects the adjustable nature of the SmartLoan,

16

which is explained on the reverse side of the mailers. We thus find this case distinguishable

from *Kudlicki v. Farragut Financial Corp.*, No. 05cv2459, 2006 WL 927281 (N.D. Ill. Jan. 20,

2006), and *Finance America*, upon which Plaintiffs rely, because neither of those cases involved

an offer for an adjustable rate mortgage. Additionally, the mailers at issue in those cases were far

more vague than the SmartLoan mailers. In *Kudlicki*, the mailer stated only that the interest rate

on an auto loan could be "as low as 5.5% APR" and that "rates *and terms* are subject to change at

any time." 2006 WL 927281 at *1-2 (emphasis added). As discussed above, the mailer in

*Finance America* contained essentially no terms at all but simply invited the recipient to call for

more information about the numerous home loan options available. 2006 WL 862832 at *1.

Further, unlike those other mailers, the SmartLoan mailers disclose how interest rates will be

calculated; although the interest rate will adjust in accordance with the Treasury Index, and thus

may be different from the Index included in the mailer, which was in effect as of February 16,

2005, an interested consumer could obtain information about the current Treasury Index, which

is a matter of public record.

Plaintiffs also point to *Klutho v. Home Loan Center, Inc.*, No. 06cv1212, 2006 U.S. Dist.

LEXIS 79759 (E.D. Mo. Nov. 1, 2006), which involved a SmartLoan mailer sent to a consumer

in Missouri by Home Loan Center, the same Defendant in this case. The court in *Klutho* found

the mailer too vague to be considered a firm offer, in part because of the lack of concrete

information about interest rates. Although there was language in the mailer explaining interest

rates, the court found the language "incomprehensible." *Id.* at *15. Plaintiffs have submitted a

copy of the mailer at issue in *Klutho*, which the Court has considered. (R. 121-3, Pl.'s Resp. to

Def.'s Mot. for Summ. J., Ex. 2 (SmartLoan mailer addressed to Thomas J. Klutho) at 2). Upon

17

review, the *Klutho* mailer's discussion of interest rates is different from the mailers at issue here, and, we think, substantially more confusing.[6] Moreover, *Klutho* was decided at the motion to dismiss stage; the court determined solely that the plaintiff had properly stated a claim under the FCRA, which is a different inquiry than whether one of the parties is entitled to judgment as a matter of law—the question before this Court. Thus, while we have given the case due consideration, we do not find *Klutho* determinative to the issues raised here.

Aside from claiming that the mailers are too vague, Plaintiffs also argue that the mailers are deceptive. First, they assert that the sample payments listed on the payment chart are "false" because they do not correspond with the "1.00%/4.27% APR" listed on the front of the mailers. (R. 96, Pl. Mem. in Supp. of Mot. for Summ. J. at 7. As Defendant points out, however, the "1.00%/4.27% APR" is followed by an asterisk, and on the reverse side the mailers state that "APR of 4.271% is based on a 30-year term, $200,000 loan amount." The mailers further explain that different APRs will apply if the loan obtained is more or less than $200,000. Because the mailers make clear that APRs will vary, we do not believe they are in violation of the FCRA.[7]

---

[6] For instance, the *Klutho* mailer stated: "Start rate of 1.5%, a 5.646 APR, a 2.5% margin and on the 30-year $200,000 loan amount at 1.5% and the effective date was 9/20/05. (R, 121-3, Pl. Resp. to Def. Mot. for Summ. J., Ex. 2 (SmartLoan mailer addressed to Thomas Klutho). We agree with the *Klutho* court that this language is incomprehensible.

[7] We offer no opinion regarding whether the mailers are in compliance with the FCRA's sister statute, the Truth In Lending Act ("TILA"), an issue not raised by Plaintiffs' complaint. TILA contains elaborate requirements regarding the advertisement of credit offers and is designed to protect consumers from making unwise financial decisions. (*See* R. 124-1, Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J., Ex. B (Federal Trade Commission, "How to Advertise Consumer Credit & Lease Terms") at 4 ("The main purpose of the Truth In Lending Act is to assure the meaningful *disclosure* of consumer credit and lease terms, including those in advertisements, so that consumers can easily compare terms and shop wisely for credit.").

18

Plaintiffs also argue that the mailers improperly lure consumers with the hope of lowering their monthly payment, when in fact the loan, due to its adjustable rate and other limitations, could end up resulting in a higher monthly payment. (R. 96, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 5-7.) As discussed above, however, the mailers disclose that APRs will vary, that interest rates are not fixed after the initial 30-day period, and that deferred interest may be added to the principal balance if the minimum payment option is selected, thus alerting consumers to the risks inherent in this type of loan. At bottom, Plaintiffs' argument appears to be a concern over the wisdom of interest-only, adjustable rate mortgages like the SmartLoan. As the Seventh Circuit has noted, however, the FCRA is designed to protect the privacy of consumers' credit histories, not to prevent them from making unwise financial choices. *Perry*, 459 F.3d at 825 n.2. For purposes of the FCRA, we do not find the mailers so vague, deceptive, or lacking in terms that they fail to provide any value to consumers interested in obtaining the type of loan being offered.

### C. *Whether The Amount of Credit Offered Was Minimal*

Third, unlike the offer in *Cole* which guaranteed only $300 toward the purchase of a car at a particular dealership, the SmartLoan offer was for a first-lien mortgage, which, depending on the value of the consumer's property, could amount to several hundred thousand dollars. *See Cole*, 389 F.3d at 728 ("[O]ne important term for courts to evaluate is the amount of credit to be extended."). The SmartLoan also offered different payment options, including an interest-only payment that could allow borrowers to lower their monthly payments, at least for a certain period, thus providing them with additional money to make home repairs, take a vacation, or to use for any other purpose they might choose. The interest-only payment, even if temporary, may

19

have value to some consumers. *See Murray*, 2006 WL 2861954 at *3 (30 to 75-day grace period before first payment of auto refinance loan was due had value to ordinary consumer who might want to shift money set aside for car payment for other purposes). The SmartLoan offer is thus considerably more valuable than the limited credit product offered in *Cole*.

Plaintiffs argue that the mailers have no value because negative amortization loans like the SmartLoan are "dangerous" and "predatory." (R. 96, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 6.) Indeed, the Federal Reserve Board has recognized that interest-only or payment-option loans are riskier than traditional, fixed-rate mortgages. (*See* R. 123, Def.'s Resp. to Pl.'s Facts, Ex. C (Fed. Reserve Bd., "Federal Financial Regulatory Agencies Issue Final Guidance on Nontraditional Mortgage Product Risks") at 1.) Nonetheless, this does not mean that Defendant's offer was entirely lacking in value for purposes of the FCRA. *See Perry*, 459 F.3d at 825; *see also Bonner v. Cortrust Bank, N.A.*, No. 05cv137, 2006 WL 1980183 at *6 (N.D. Ind. July 12, 2006) ("[W]e need not determine whether the offer is a good one, only whether it is an offer with some value to a consumer as an extension of credit."); *Poehl v. Countrywide Home Loans, Inc.*, --- F. Supp. 2d ---, 2006 WL 3628982 at *3 (E.D. Mo. Nov. 1, 2006) ("It is not the Court's job to decide whether accepting a particular offer might be unwise.")

Moreover, as the Federal Reserve Board has recognized, an interest-only or payment-option mortgage may be useful to some consumers, including consumers with irregular income who want flexibility in their payments; consumers with considerable equity in their home who wish to use the money that would otherwise go toward principal payments for other investments; or consumers who have modest current income but reasonably expect that their income will increase in the future, for example, persons completing a degree or training program. (R. 124,

20

Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J., Ex. A (Bd. of Govs. of the Fed. Reserve Sys.,

"Interest-Only Mortgage Payments and Payment-Option ARMS, Are They For You?") at 7.)

Thus, even if the SmartLoan is not "an attractive deal to the great majority of consumers," *see*

*Perry*, 459 F.3d at 825, the loan may have utility for some consumers. Further, we note that

evidence before us indicates that some consumers do choose to obtain interest-only loans despite

their risks. (R. 124-2, Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J., Ex. A (Fed. Trade

Comm'n Letter to Bd. of Govs. of Fed. Reserve Sys.) at 24 ("[T]he most prevalent alternative

mortgage product today is the [interest-only] loan, which commanded more than 25% share of

the mortgage market in 2005, up sharply from less than 2% of the market in 2000.").) Therefore,

pursuant to *Perry*, we find that the offer has sufficient value for purposes of the FCRA.

Because we conclude that Defendant had a permissible purpose for accessing the

Plaintiffs' credit reports, namely, to send them a firm offer of credit for the SmartLoan program,

we need not address whether Defendant's actions constituted a willful violation of the FCRA.

(*See* R. 96, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 11-15; R.124-1, Def.'s Mem. in Opp. to

Pl.'s Mot. for Summ. J. at 12-14.) We also need not revisit Defendant's argument, which we

previously rejected, that Plaintiffs are required to demonstrate actual injury in order to recover

under the FCRA. *See Cavin*, 239 F.R.D. at 393.

## PLAINTIFFS' MOTION FOR DISCOVERY
## AND APPROVAL OF CLASS NOTICE

One final administrative matter requires our attention. In the midst of briefing on the

summary judgment motions, Plaintiffs filed a motion asking that the Court: (1) compel

Defendant to produce a list of class members; and (2) approve the mailing of notice to the class.

(R. 104-1, Pl's Mot. for Appr. of Mailing of Notice & Production of Class List at 1-4.) In response, Defendant argues that the motion should be denied and that nothing in the Federal Rules requires notice to be sent to the class before resolution of the parties' summary judgment motions. (R. 114, Resp. & Obj. to Pl's Mot. at 1-2.)

Rule 23 does not specify when notice to the class must be sent. Instead, the Rule affords the Court discretion to control the manner in which a class action proceeds, including the timing of the mailing of notice to the class. *See* Fed. R. Civ. P. 23(d); *Beale v. EdgeMark Fin. Corp.*, No. 94 C 1890, 1995 WL 631840 at *1 (N.D. Ill. Oct. 23, 2006) (observing that Rule 23(c)(2) does not address when class notice must be sent, "thus leaving the question to the sound discretion of the Court."); *see also In Re Bally Mfg. Sec. Litig.*, 144 F.R.D. 78, 82 (N.D. Ill. 1992) (determining that notice would not be sent where class was certified at same time case was dismissed).

Here, several factors weigh in favor of not requiring notice the class. First, we have determined that Plaintiffs' FCRA claim lacks merit and that Defendant is entitled to judgment. *See Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) ("To require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake.") Second, Defendant has made clear its position that it wishes to forego the protection it would receive if notice were sent to class members prior to entry of judgment. (R. 114, Resp. & Obj. to Pl's Mot. at 2-3.) Third, Plaintiffs have not argued that they would be prejudiced by proceeding in this manner,[8] nor can we perceive of any prejudice that

---

[8] We note that Plaintiffs did not file a reply in support of their motion, despite the fact that the Court afforded them an opportunity to do so. (*See* R. 107.)

22

would result to absent class members if notice is not sent; they simply will not be bound by the judgment. *Bally*, 144 F.R.D. at 82 ("the only persons conceivably prejudiced by the failure to give notice are defendants" because absent class members would not be bound by adverse ruling); *see also Wooten v. Hamilton County*, 94 F.R.D. 176, 177 (S.D. Ohio 1982) (declining to send out notice prior to ruling on cross-motions for summary judgment so that "plaintiff would not have been put to the expense of notifying the class in a losing cause"). In light of these circumstances, Plaintiffs' request for an order compelling Defendant to produce a class list and for approval of the notice to class members is denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment ( R. 94) is denied, and Defendant's motion for summary judgment (R. 88) is granted. Plaintiffs' motion for production of a class list and approval of notice to be sent to absent class members (R. 104-1) is denied. The Clerk is directed to enter judgment for Defendant.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** January 10, 2007

23